AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| ELLICOTT DREDGES, LLC, | : |
| | : |
| | :    No. 01-21-0016-9413 |
| Claimant, | : |
| | : |
| v. | : |
| | : |
| NORTHERN METAL FAB. INC. | : |
| | : |
| Respondent. | : |

## AMENDED COMPLAINT

Claimant, Ellicott Dredges, LLC, a Maryland limited liability company ("Ellicott"), by its undersigned attorneys, and for its Complaint against Respondent, Northern Metal Fab. Inc. ("NMF"), a Wisconsin corporation, (together with Ellicott, the "Parties") states as follows.

### Parties

1.  Ellicott is Maryland limited liability company with its principal place of business located at 1611 Bush Street, Baltimore, Maryland 21230. Ellicott designs, manufactures, and sells cutter suction dredges all over the world. The Ellicott brand name has been known worldwide for durable, capable, and versatile dredges, going back to the original construction of the Panama Canal.

2.  NMF is a Wisconsin corporation with its principal place of business located at 500 Evergreen Street, Baldwin, Wisconsin 54002. NMF is a fabricator and a manufacturer of metal, steel, and aluminum parts with over 30 years of experience.

3.  NMF holds itself out as a capable vendor for equipment painting or "finishing." NMF advertises its finishing services on its website main page, touting its "on-site shot blasting and wet coat painting facilities." On the same page, NMF tells prospective customers that it

1

EXHIBIT 3

maintains "a sizable labor pool with deep expertise…" and that "NMF Means Quality."

4. Ellicott relied on NMF's representations about the skill of its workforce and the company's abilities when deciding whether or not to contract with NMF.

## Jurisdiction, Venue, and Applicable Law

5. The American Arbitration Association has jurisdiction over the disputes contained herein pursuant to Purchase Orders # 0073358 and # 0073364 (together and with the Terms and Conditions of Purchase incorporated therein, the "Contract")[1], which forms a binding contractual agreement between the Parties. A true and correct copy of the Contract is attached hereto as **Exhibit 1**.

6. Other work at issue in this case is described in Purchase Orders # 0066827 (for the dredge bearing serial number 402150) and #0066831 (for the dredge bearing serial number 402160), which are attached hereto as **Exhibits 4** and **5** respectively. Each Purchase Order contains an arbitration clause that brings the claims contained herein within the jurisdiction of the American Arbitration Association.

7. Venue is proper because the Parties selected Baltimore, Maryland as the location for any arbitration proceedings arising from the Contract and the other Purchase Orders.

8. Pursuant to the Contract and the other Purchase Orders, the laws of the State of Maryland govern the Contract, the work performed under the other Purchase Orders, and this arbitration.

## The Contract

9. Under the terms of the Contract, NMF was to sell to Ellicott a complete tank set

---

[1] In addition to the two Purchase Orders, the Contract also includes the Terms and Conditions of Purchase, which was attached to each Purchase Order and incorporated fully therein. Each purchase order was for part of the Tank Set, which NMF was aware would be integrated into one single dredge. Therefore, the two Purchase Orders and the Terms and Conditions of Purchase are treated as one Contract between Ellicott and NMF.

(the "Tank Set"), for which NMF was responsible from start-to-finish, all the way from procuring the necessary raw materials to building and painting the Tank Set. The Contract's purchase price was $280,200.

10. The scope of NMF's work on the Tank Set explicitly included, but was not limited to: "provide supervision, labor, equipment, and purchase materials to fabricate, outfit, fit-check, compartment testing, blasting, prime and finish painting":

> SCOPE OF WORK: PROVIDE SUPERVISION, LABOR, EQUIPMENT, AND PURCHASE MATERIALS TO FABRICATE, OUTFIT, FIT-CHECK, COMPARTMENT TESTING, BLASTING, PRIME AND FINISH PAINTING, AND LOADING OUR ASSIGNED CARRIER'S EQUIPMENT THE ABOVE STRUCTURE(S) PER THEIR APPLICABLE DRAWING'S SPECIFICATIONS, NOTES, AND TOLERANCES, TO INCLUDE ALL SUPPLEMENTAL DRAWINGS LISTED IN THE LEGENDS.

11. The Contract also required NMF to perform its work to good manufacturing standards and in compliance with provided specifications. Regarding paint, the Contract included painting specifications that required NMF to, among other things, prepare the Tank Set's surfaces by sandblasting all interior and exterior surfaces and use Window Grey primer:

> PAINTING SPECIFICATIONS:
>
> CENTER TANK TO BE PAINTED ELLICOTT BLUE BELOW DECK LINE AND WHITE ABOVE DECK LINE. THE DECK LINE ON THE CENTER TANK IS WHERE IT MATCHES TO THE HEIGHT OF THE SIDE TANKS.
>
> SANDBLAST ALL INTERIOR AND EXTERIOR SURFACES, PROTECTING MACHINED SURFACES, TO SSPC-SP10, 2 MIL PROFILE. PAINT THE INTERIOR OF THE CENTER PONTOON WITH PPG AMERLOCK 2, RAL 7040 WINDOW GREY, 2 COATS @ 4.0 TO 7.0 MILS DFT/COAT. PAINT THE EXTERIOR SURFACES WITH THE SAME PROCEDURES AS THE INTERIOR SYSTEM, BUT USING PPG ELLICOTT BLUE, RAL 5010, GENTIAN BLUE, PSX 700. THE PPG PSX 700 PAINT TO BE APPLIED PER THE MANUFACTURER'S INSTRUCTIONS FOR IMMERSION SERVICE. .
>
> SPONSON/SIDE TANKS/PONTOONS ARE PREPARED AND PAINTED IN THE SAME MANNER AS THE CENTER PONTOON. ALL EXTERIOR SURFACES OF THE SIDE TANKS ARE ELLICOTT BLUE.
>
> FUEL TANKS: BLAST, CLEAN, AND COAT WITH WITH CLEAN MOTOR OIL TO PREVENT RUSTING.
>
> HYDRAULIC TANK(S): BLAST, CLEAN, AND COAT WITH ENAMAL, RED, 1201 GLYPTAL PER MANUFACURER'S APPLICATION INSTRUCTIONS.

12. The Terms and Conditions of Purchase (the "General Terms"), attached to the Contract and incorporated fully therein, required NMF to adhere to the Contract's listed specifications. This included, but was not limited to, the paint specification listed above:

> **15. ADHERENCE TO SPECIFICATIONS:** Seller shall only tender for delivery those items that conform to the requirements of this Purchase Order. Ellicott reserves the right to inspect or test any work, product, supplies or services that have been tendered for acceptance. In addition to any other rights reserved herein, Ellicott may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in Purchase Order price. If repair/replacement or reworking will not correct the defects or is not possible, then Ellicott may seek an equitable price reduction or adequate consideration for acceptance of nonconforming work, product, supplies or services. The remedy will be a mutually agreed upon modification, or price / other considerations.

13. The Contract included an express warranty:

> WARRANTY:
> THE CONTRACTOR GUARANTEES TO REPAIR, REPLACE, OR MAKE GOOD TO THE SATISFACTION OF ELLICOTT DREDGES, ANY DEFECT IN WORKMANSHIP APPEARING IN THE FABRICATONS PROVIDED UNDER THIS CONTRACT FOR A PERIOD OF ONE (1) YEAR AFTER THE DREDGE IS ACCEPTED BY OUR CUSTOMER.

14. The General Terms also required NMF to repair or replace defective parts or credit Ellicott with the full purchase price and incoming freight charges:

> 1. QUALITY: All materials are to be new and supplies are subject to inspection and approval within a reasonable amount of time after arrival at Ellicott's plant or the agreed delivery address. Materials which prove defective, either upon inspection, during the machining process, or during assembly, or within one year after being put into service shall be replaced by Seller without any additional charges to Ellicott including but not limited to incoming transportation charges. Seller shall also repair any damage caused by their defective materials. If Ellicott does not desire replacement of defective materials then Ellicott shall be credited with the full purchase price and incoming freight charges.

15. The Contract required NMF to provide a certificate of compliance attesting that "ALL BLASTING AND PAINTING WAS DONE IN ACCORDANCE WITH THE PAINT MANUFACTURER'S INSTRUCTIONS." NMF's willingness to agree to submit a certificate of compliance provided Ellicott with confidence to enter into the Contract with NMF.

16. On April 4, 2020, NMF sent Ellicott a Certificate of Conformity, signed by an authorized representative, stating that the Tank Set being delivered to Ellicott pursuant to the Purchase Order # 0073358 "conform[ed] with the purchase order requirements, engineering drawings and published specifications." A true and correct copy of the Certificate of Conformity relating to Purchase Order #

40011035.5

0073358 is attached hereto as **Exhibit 2**.

17. Also on April 4, 2020, NMF sent Ellicott a second Certificate of Conformity, signed by an authorized representative, stating that the Tank Set being delivered to Ellicott pursuant to the Purchase Order # 0073364 "conform[ed] with the purchase order requirements, engineering drawings and published specifications." A true and correct copy of the Certificate of Conformity relating to Purchase Order # 0073364 is attached hereto as **Exhibit 3**.

18. Unbeknownst to Ellicott, NMF had badly failed to perform its finishing work to Contract specifications. On information and belief, NMF knowingly failed to properly sandblast the surfaces of the Tank Set, failed to use primer, and did not apply paint to the Tank Set consistent up to industry standards and/or the specifications called for in the Contract.

19. On information and belief, NMF did not possess adequate personnel or relevant expertise to finish the Tank Set. On information and belief, NMF knowingly misrepresented its capabilities to Ellicott to induce Ellicott to enter the Contract.

## The Dredge Experiences Paint Defects

20. NMF delivered the Tank Set to Ellicott at Ellicott's facility in New Richmond, Wisconsin. The three separate tanks comprising the complete Tank Set were each delivered individually, with the starboard tank arriving in October 2018; the center tank arriving in December 2018; and the port side tank arriving in March 2019.

21. Ellicott assembled the Dredge, integrating the Tank Set, and shipped

40011035.5

the Dredge to Southwind at Southwind's facility in Indiana by September 2019.

22. Southwind held the Dredge in storage for a number of months before shipping the Dredge to the St. John's shipyard in Palatka, Florida in July 2020.

23. On or about July 23, 2020, Southwind placed the Dredge in the water for the first time.

24. On August 24, 2020, Southwind began final assembly and commissioning of the Dredge, and in September 2020, the Dredge was mobilized in Blount Island, Florida.

25. In September 2020, the paint on the Dredge delaminated in significant quantities. It was clear that the metal surface of the Tank Set had not been prepared for paint to adhere to it once the Dredge was exposed to water. Further inspection revealed that NMF had not properly sandblasted the Tank Set, did not use primer, and did not apply the paint in the proper thickness—all of which the specifications in the Contract required.

26. As a result of NMF's poor workmanship, Ellicott's customer, Southwind, was forced to incur significant damages associated with remedying the paint defect, totaling, on information and belief, over $200,000.

**NMF Refuses to Accept Responsibility for Poor Workmanship**

27. On October 30, 2020, an Ellicott representative contacted NMF executives to inform them about the paint defects. Ellicott sent NMF photographs and a video showing major paint peeling and heavy surface rust as a result of defective finishing. Ellicott informed NMF in the same message that an initial review by the paint's manufacturer, PPG Paint, suggested "that the root cause [was]

improper surface preparation and lack of the…primer base coat." Ellicott requested that NMF join Ellicott on a site visit to inspect the Dredge.

28. Despite glaring evidence of its deficient work, NMF responded on November 13, 2020 by flatly refusing to join Ellicott on the site visit.

29. On December 1, 2020, PPG Paint performed an independent, expert analysis of the Dredge's paint issues. PPG Paint issued its report on January 12, 2021.

30. Among other things, PPG Paint's expert found that the Tank Set's "paint was chipping down to bare carbon steel substrate on various surfaces." The paint specifications listed in the Contract required that the steel be abrasive blast cleaned to SSPC SP6 and that NMF apply a prime coat. But the expert attributed the chipping paint in part to the fact that he "didn't see evidence of what [he] would call a prime coat." The report stated that when a surface is properly prepared and the paint is applied properly, paint "is highly unlikely to disbond," as it had done here.

31. On February 1, 2021, Ellicott sent NMF a detailed letter summarizing the paint defects identified by the PPG Paint expert. At NMF's request, on February 5, 2021, Ellicott forwarded the raw data used to reach the expert's conclusion. The same message explained to NMF that the PPG Paint expert—who is certified by NACE (National Association of Corrosion Engineers)—stated that he concluded "the issue of the rust and delaminating paint [was] due to an inadequate initial abrasive blasting of steel surfaces prior to the application of the specified coating system."

32. Despite being presented with voluminous evidence of its defective work, NMF repeatedly dragged its feet and refused to cooperate in a meaningful way with either Ellicott or Southwind. On March 23, 2021, Ellicott's CEO and NMF's president participated in a call to discuss the Dredge's paint issues. Ellicott followed the call by sending NMF emails and additional pictures further evidencing NMF's deficient workmanship. Through a series of emails and video conferences between Ellicott and NMF in early April 2021, it became increasingly clear that NMF was unwilling to change its stance and accept responsibility or cooperate with Ellicott.

33. Finally, on April 22, 2021, NMF and Ellicott jointly visited the Dredge into which the Tank Set was integrated. Despite seeing its poor workmanship first-hand, NMF steadfastly refused to accept responsibility for its grossly deficient work product.

**Southwind Seeks to Hold Ellicott Responsible for NMF's Poor Workmanship that Resulted in Paint Defects**

34. On July 27, 2021, Southwind filed a complaint against Ellicott in the United States District Court for the District of Maryland. In its complaint, Southwind sought "damages in excess of $75,000" resulting from the remedial efforts that Southwind was forced to take as a result of NMF's poor workmanship.

35. On information and belief, Southwind sought damages from Ellicott of approximately $200,000.

36. After obtaining counsel, who participated in motions practice, Ellicott settled with Southwind at the end of vigorous negotiations. Pursuant to that settlement, Southwind assigned any claims it had against NMF to Ellicott.

37. As a result of NMF's performance of deficient work, failure to adhere to the requirements and specifications clearly laid out in the Contract, and refusal to take remedial actions, Ellicott has suffered damages and will continue to suffer damages.

### NMF's Other Shoddy Work Demonstrates a Pattern and/or Practice of Obtaining Ellicott's Business by Misrepresenting its Abilities

38. At around the same time Ellicott contracted with NMF for the Tank Set, Ellicott contracted with NMF to produce, paint, and finish tanks for other dredges.

39. NMF fabricated, painted, and finished two side tanks for a dredge with serial number 402150 (the "Florida Dredge"), the Purchase Order for which is attached as **Exhibit 4**. As with the Contract, NMF agreed to provide a certificate of compliance for the Florida Dredge work, attesting that "ALL BLASTING AND PAINTING WAS DONE IN ACCORDANCE WITH THE PAINT MANUFACTURER'S INSTRUCTIONS."

40. As with the Tank Set, Ellicott relied on NMF's willingness to agree to submit a certificate of compliance and NMF's other representations about the quality of its work when deciding to engage NMF for the Florida Dredge.

41. Specifically, in the months leading up to December 20, 2016, the date of the Purchase Order, members of NMF represented that the company could, at a level consistent with industry standards: (1) sandblast all interior and exterior surfaces while protecting the machined surfaces; and (2) paint the interior and exterior surfaces consistent with Ellicott's specifications and the intended use of the tanks.

10

42. After NMF completed the tanks, Ellicott completed assembly of the Florida Dredge. Ellicott then decided it would rent the dredge out before selling it used.

43. An Ellicott customer rented the Florida Dredge in May of 2019, and put it to use for six months before returning it in December 2019. The Florida Dredge's side tanks exhibited major paint defects at the time it was returned. The center tank, which was not fabricated or finished by NMF, did not exhibit major defects.

44. Around the same time, Ellicott customer Gator Dredging expressed interest in buying a dredge from Ellicott, and Ellicott proposed that Gator buy the Florida Dredge. Ellicott originally issued a quote to Gator Dredging for $1,810,000, a price Ellicott knew to be consistent with the market price for a dredge with six months' worth of wear and tear.

45. In July 2020, Gator Dredging and Ellicott inspected the Florida Dredge together in storage. Ellicott and Gator discovered that by that time, the paint defects caused by NMF's deficient work had deteriorated into full-scale rusting on the tanks.

46. To sell the Florida Dredge, Ellicott was required to discount its quoted price by $60,000. Gator Dredging purchased the Florida Dredge for $1,750,000 in November 2020.

47. At the same time Ellicott engaged NMF related to the Florida Dredge, it also engaged NMF to fabricate, paint, and finish two side tanks that were incorporated into another dredge, serial number 402160, that was ultimately sold to

11

Ellicott customer Goodloe Dredging (the "Goodloe Dredge"). The Purchase Order for that work is attached hereto as **Exhibit 5**.

48. As with the Contract, NMF agreed to provide a certificate of compliance attesting that "ALL BLASTING AND PAINTING WAS DONE IN ACCORDANCE WITH THE PAINT MANUFACTURER'S INSTRUCTIONS."

49. As with the Tank Set and the Florida Dredge, Ellicott relied on NMF's willingness to agree to submit a certificate of compliance and NMF's other representations about the quality of its work when deciding to engage NMF for the Goodloe Dredge.

50. Specifically, in the months leading up to December 20, 2016, the date of the Purchase Order, members of NMF represented that the company could, at a level consistent with industry standards: (1) sandblast all interior and exterior surfaces while protecting the machined surfaces; and (2) paint the interior and exterior surfaces consistent with Ellicott's specifications and the intended use of the tanks.

51. The Goodloe Dredge shipped to the customer in July 2019.

52. In March 2021, an Ellicott representative visited Goodloe on an unrelated matter. On the visit, it was apparent that the two side tanks on the Goodloe Dredge, which had been fabricated and finished by NMF, had been freshly painted. The center tank, which was fabricated and finished by a third-party, was not freshly painted. Goodloe's owner, Ben Goodloe, explained in a frustrated manner that the side tanks had been repainted because the original paint had all faded away or peeled off, a problem he blamed on Ellicott.

40011035.5

53. While Goodloe has not demanded compensation for NMF's shoddy work, Ellicott has suffered reputational consequences with Goodloe, and expects not to receive future orders from Goodloe unless Ellicott offers a discount.

54. On information and belief, NMF knowingly misrepresented its capabilities to Ellicott to induce Ellicott to hire NMF to fabricate, paint, and finish the tanks on the Florida Dredge and the Goodloe Dredge.

55. On information and belief, NMF knowingly failed to properly sandblast the surfaces of the tanks it fabricated for both the Florida Dredge and the Goodloe Dredge, failed to use primer, and did not apply paint to these tanks consistent with industry standards.

56. On information and belief, NMF did not possess adequate personnel or relevant expertise to finish the tanks on the Florida Dredge or the Goodloe Dredge.

<u>**Count I**</u>
**(Breach of Contract)**

57. Ellicott incorporates the previous paragraphs as if set forth fully herein.

58. The Parties entered into a binding Contract, pursuant to which NMF agreed to sell to Ellicott a complete Tank Set. In order to provide the Tank Set, the Contract required NMF to, among other things, the following: "PROVIDE SUPERVISION, LABOR, EQUIPMENT, AND PURCHASE MATERIALS TO FABRICATE…BLASTING, PRIME AND FINISH PAINTING" the Tank Set.

59. The Contract also prescribes specific painting specifications that NMF was bound to follow, which required NMF to properly sandblast and prepare

13

the Tank Set's surfaces for painting, to apply Window Grey primer, and finally, to paint the Tank Set using the specified thickness of paint.

60. Subsequent investigations by industry experts revealed that NMF failed to prepare and paint the Tank Set in accordance with the Contract and the applicable specifications, including the fact that NMF failed to adequately sandblast the metal surfaces and failed to use primer.

61. By providing Ellicott with the defective Tank Set, going to the heart of the Contract between the Parties, NMF materially breached the Contract. Ellicott has suffered damages as a result.

## Count II
### (Breach of Express Warranty)

62. Ellicott incorporates the previous paragraphs as if set forth fully herein.

63. The Contract provided express warranties in two places. First, each Purchase Order contained a warranty, through which NMF "GUARANTEE[D] TO REPAIR, REPLACE, OR MAKE GOOD TO THE SATISFACTION OF ELLICOTT DREDGES, ANY DEFECT IN WORKMANSHIP APPEARING IN THE FABRICATIONS PROVIDED UNDER THIS CONTRACT FOR A PERIOD OF ONE (1) YEAR AFTER THE DREDGE IS ACCEPTED BY [ELLICOTT'S] CUSTOMER." Second, in the Terms and Conditions of Purchase, NMF warranted that "[m]aterials which prove defective, either upon inspection, during the machining process, or during assembly, or within one year after being put into service shall be replaced by [NMF,]" but "[i]f Ellicott does not desire replacement of defective materials then Ellicott shall be credited with the full

14

purchase price and incoming freight charges."

64. The Tank Set was defective as a result of NMF's failure to adequately sandblast and otherwise prepare the surfaces of the Tank Set and NMF's failure to apply the required primer. As a result, the paint delaminated and rust emerged on the Tank Set upon contact with the water.

65. Ellicott alerted NMF to the defective nature of its work, but NMF has refused to honor its warranty.

66. Ellicott has suffered damages and continues to suffer damages as a result of NMF's refusal to honor its warranty.

## Count III
### (Breach of Implied Warranty of Merchantability)

67. Ellicott incorporates the previous paragraphs as if set forth fully herein.

68. NMF, as a fabricator and manufacturer, is a merchant with respect to goods, such as the Tank Set.

69. Under Maryland's Commercial Code, NMF is bound by the implied warranty that the Tank Set would, at the very least, pass without objection in the trade under the Contract.

70. The Tank Set provided to Ellicott amounts to a breach of NMF's implied warranty of merchantability. It was deficiently prepared, leached paint, and rusted upon being placed in the water—failing at the very function for which it was designed and purchased.

71. As a direct result of NMF breaching its implied warranty of merchantability, Ellicott incurred damages and continues to incur damages.

15

## Count IV
### (Breach of Implied Warranty of Fitness for a Particular Purpose)

72. Ellicott incorporates the previous paragraphs as if set forth fully herein.

73. At all relevant times, NMF knew that Ellicott was purchasing the Tank Set for use in a dredge that would ultimately be sold to an Ellicott customer.

74. NMF is a fabricator and manufacturer holding itself out as an expert in the field. This includes, but is not limited to, NMF touting its "on-site shot blasting and wet coat painting facilities," boasting of "a sizable labor pool with deep expertise…" and that stating "NMF Means Quality."

75. Ellicott justifiably and reasonably relied on NMF's skill and judgment to furnish a suitable Tank Set fit for sale to a customer as part of the customer's purchase of a dredge.

76. NMF is bound by the implied warranty of fitness for a particular purpose—namely, that it would provide Ellicott with a Tank Set fit for such a purpose.

77. NMF breached this obligation by providing to Ellicott a Tank Set that was defectively prepared, defectively painted, and unfit for sale to Ellicott's customer.

78. As a result of NMF's breach, Ellicott suffered damages and continues to suffer damages.

## Count V
### (Negligence)

79. Ellicott incorporates the previous paragraphs as if set forth fully

herein.

80. NMF owed Ellicott a duty of care to provide a Tank Set, as well as tanks for the Florida Dredge and the Goodloe Dredge, that were free of paint and other finishing defects.

81. NMF breached that duty when it provided Ellicott with defective tanks that were incapable of holding paint when placed in the water.

82. NMF's failure to provide Ellicott with tanks free of defects has directly caused Ellicott harm resulting in damages that Ellicott has suffered and continues to suffer.

**Count VI**
**(Negligent Misrepresentation)**

83. Ellicott incorporates the previous paragraphs as if set forth fully herein.

84. NMF owed Ellicott a duty of care to accurately represent its painting and finishing abilities, and the quality of the work it had performed for Ellicott.

85. NMF sent Ellicott a Certificate of Conformity for each Purchase Order that is part of the Contract. Each Certificate of Conformity, signed by an authorized representative, stated that each tank comprising the Tank Set "conform[ed] with the purchase order requirements, engineering drawings and published specifications."

86. These representations were false.

87. With regard to both the Tank Set, and the work that NMF performed for the Florida Dredge and the Goodloe Dredge, NMF made numerous material representations about the skill of its workforce and the company's abilities to

17

perform painting and finishing work in advance of Ellicott hiring NMF for this work.

88. These representations were false.

89. NMF knew or should have known that it failed to comply with the Contract and the paint specifications listed in the Certificates of Conformity.

90. NMF knew or should have known that its representations about the skill of its workforce and the company's abilities were false.

91. NMF made these misrepresentations knowing that Ellicott would rely on them. NMF knew that Ellicott would accept and subsequently incorporate NMF's tanks into the Dredge, the Florida Dredge, and the Goodloe Dredge, and sell those dredges to third-parties as a result.

92. NMF knew or should have known that Ellicott had no reasonable opportunity to detect the defects in NMF's work prior to sale.

93. NMF knew or should have known that Ellicott's justifiable reliance on its representations would cause injury to Ellicott, because Ellicott would, in turn, incorporate NMF's defective work into Ellicott's dredge for sale to Ellicott's customers.

94. As a result of Ellicott's justifiable reliance on NMF's misrepresentations, Ellicott has suffered damages and continues to suffer damages.

## Count VII
**(Fraudulent Misrepresentation)**

95. Ellicott incorporates the previous paragraphs as if set forth fully herein.

96. NMF falsely represented that it had the expertise and personnel to

adequately complete its scope of work under the Contract, and similar work for the Florida Dredge and the Goodloe Dredge.

97. NMF falsely represented that it prepared the Tank Set in a manner that conformed with the Contract and the applicable specifications.

98. NMF knew—or at the very least was reckless with respect to—the fact that the Tank Set was not prepared in accordance with the Contract and the applicable specifications.

99. NMF knew—or at the very least was reckless with respect to—the fact that the work performed for the Florida Dredge and the Goodloe Dredge was materially deficient and did not conform to industry standards.

100. With regard to the Tank Set, NMF provided Ellicott with the Certificates of Authority, signed by an authorized NMF representative, for the purpose of defrauding Ellicott.

101. With regards to all of the work that NMF performed, NMF misrepresented its abilities for the purpose of defrauding Ellicott.

102. NMF's knowing misrepresentations were made with actual malice.

103. Ellicott relied on the assurances made by NMF as to its capabilities, and in the Certificates of Authority. Such reliance was reasonable and justified because NMF holds itself out as possessing the capabilities to deliver on work such as the scope of work under the Contract and the work for which it was hired for the Florida Dredge and the Goodloe Dredge; the defects in NMF's work were latent; NMF was in the best position to know of any such defects; and NMF had an obligation to perform in a workmanlike manner and provide Ellicott with tanks that

were free of defects.

104. Ellicott suffered damages and continues to suffer damages as a result of its justifiable reliance on NMF's intentional and fraudulent misrepresentations.

WHEREFORE, Ellicott Dredges, LLC respectfully requests an arbitration award in its favor and an order from the American Arbitration Association as follows:

A. enter judgment in favor of Ellicott and against NMF in an amount not less than full reimbursement for the Purchase Orders, and the discount Ellicott was forced to offer on the Florida Dredge, totaling $340,200;

B. award Ellicott punitive damages for NMF's fraud; and

C. grant Ellicott such other and further relief as the Arbitrator deems just and appropriate, including costs, expenses, and reasonable attorneys' fees incurred in connection with this action.

Respectfully submitted,

Dated: May 26, 2022

/s/ *Jordan D. Rosenfeld*
Michelle N. Lipkowitz (Bar No. 0212180016)
Jordan D. Rosenfeld (Bar No. 1312190078)
Saul Ewing Arnstein & Lehr LLP
500 East Pratt Street, Suite 900
Baltimore, Maryland 21202
michell.lipkowitz@saul.com - (410) 332-8603
jordan.rosenfeld@saul.com – (410) 332-8612