IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EMCASCO INSURANCE COMPANY,

                Plaintiff,

      v.

NORTHERN METAL FAB., INC.
and ELLICOTT DREDGES, LLC,

                Defendants.

OPINION AND ORDER

22-cv-443-wmc

---

In this lawsuit, plaintiff EMCASCO Insurance Company seeks a declaratory judgment that it is not obligated to indemnify or defend its insured, Northern Metal Fab., Inc., in an arbitration proceeding.  In that proceeding, Ellicott Dredges, LLC advances a series of claims arising out of its purchase of allegedly defective dredge tanks from defendant Northern.  Presently before the court is EMCASCO's "Motion for Summary Declaratory Judgment" that Northern's liability insurance policy not only does not cover, but expressly excludes coverage of, the claims at issue in arbitration.  (Dkt. #18.)

Having met its burden to prove that at least some of Ellicott's claims in the arbitration are not covered or are otherwise excluded by the policy's Manufacturer's Errors or Omissions ("E&O") endorsement, EMCASCO is entitled to partial summary judgment.  However, to the extent that the E&O endorsement does not unambiguously exclude coverage for the remaining claims on which Northern may seek indemnification, EMCASCO's motion will be denied.

FACTS

### A. Background[1]

EMCASCO issued a Commercial General Liability insurance policy to Northern, which was renewed annually from the policy's inception on May 15, 2018 through May 15, 2021. EMCASCO also insured Northern under an E&O endorsement to the policy effective during that same period.[2] EMCASCO is incorporated under the laws of Iowa and has its principal place of business in Des Moines, Iowa. EMCASCO is authorized to write liability insurance policies in Wisconsin.

Northern is a Wisconsin corporation with its principal place of business in Baldwin, Wisconsin. Northern manufactures sheet metal, heavy plate steel, stainless steel, aluminum parts, weldments, and assemblies. Northern's customer, Ellicott, is incorporated under the laws of Maryland, with its principal place of business in Baltimore, Maryland, and a manufacturing facility in New Richmond, Wisconsin. Ellicott designs, manufactures, and sells cutter suction dredges.

In April 2018, Ellicott purchased a set of tanks from Northern. The purchase contract required Northern to "perform its work to good manufacturing standards and in

---

[1] Although the duty to defend under an insurance policy is determined with reference to the facts alleged in the complaint against which a defense is sought, the following summary is taken from the parties' pleadings in this case, the amended complaint in the arbitration, and the relevant insurance policy itself. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). However, where noted, the court also considers relevant evidence from other sources.

[2] An "errors-and-omissions policy is professional-liability insurance . . . designed to insure members of a particular professional group from liability arising out of the special risk such as negligence, omissions, mistakes and errors inherent in the practice of the profession." *Crum & Forster Spec. Ins. Co. v. DVO, Inc.*, 939 F.3d 852, 854-55 (7th Cir. 2019) (citations omitted).

compliance with provided specifications" regarding the tanks' paint, including "sandblasting all interior and exterior surfaces" using "Window Grey primer." (Amend. Arb. Compl. (dkt. #1-3) ¶¶ 11, 12.) The purchase contract also included an express, one-year warranty, for "ANY DEFECT IN WORKMANSHIP," as well as a requirement that Northern provide certificates of compliance attesting that all blasting and painting for the tanks was done in accordance with the paint manufacturer's instructions, which Northern sent Ellicott after the tanks' completion. (*Id.* at ¶¶ 13, 15-17.)

Northern delivered the tank set to Ellicott's manufacturing facility in New Richmond between October 2018 and March 2019. Ellicott subsequently assembled a dredge with Northern's tanks built-in that was shipped to its buyer Southwind in September 2019. Southwind kept that dredge in storage for several months before sending it to Florida and placing it in the water for the first time in July 2020. Southwind began the final assembly and commissioning of the dredge in August 2020, which was put into service the following month.

### B. Paint Dispute

Shortly thereafter, the paint on Southwind's dredge apparently delaminated significantly, and according to Ellicott, "[i]t was clear that the metal surface of the [t]ank [s]et had not been prepared for paint to adhere to it once the dredge was exposed to water." (*Id.* at ¶ 25.) Further inspection of the tanks allegedly revealed that Northern had not properly sandblasted the tank set, had not used primer, and did not apply the paint in the proper thickness as required by the contract's specifications.

In October 2020, an Ellicott representative informed Northern about the dredge's

paint defects, noting that an initial review by the paint's manufacturer, PPG Paint, had suggested "that the[ir] root cause [was] improper surface preparation" of the tanks "and lack of the . . . primer base coat." (*Id*. at ¶ 27.) An expert analysis conducted by PPG Paint in December 2020 later found that the tank set's paint was chipping down to bare carbon steel substrate on various surfaces, which the expert again attributed to the tanks' lack of a prime coat. The PPG Paint expert's report "stated that when a surface is properly prepared and the paint is applied properly, paint 'is highly unlikely to disbond[.]'" (*Id*. at ¶ 30.) Although Northern and Ellicott discussed these paint issues over the course of March and April 2021, Northern refused to accept responsibility for them.

On July 27, 2021, Southwind filed a complaint against Ellicott in the U.S. District Court for the District of Maryland, seeking approximately $200,000 in damages for "the remedial efforts that Southwind was forced to take as a result of [Northern's] poor workmanship" on the tank set. (*Id*. at ¶¶ 26, 34, 35.) After "vigorous negotiations[,]" Ellicott settled with Southwind, which assigned any claims it had against Northern to Ellicott. (*Id*. at ¶ 36.)

### C. Arbitration Proceedings

On October 15, 2021, Ellicott commenced arbitration proceedings against Northern through the American Arbitration Association. Ellicott's initial complaint in the arbitration asserted seven tort- and contract-based claims, all arising out of Northern's allegedly "deficient work, failure to adhere to the requirements and specifications clearly laid out in the [c]ontract, and refusal to take remedial actions" with respect to the tank set built into the Southwind dredge. (Arb. Compl. (dkt. #1-2) ¶ 36.)

4

Ellicott subsequently filed an amended complaint in the arbitration on May 26, 2022, adding claims related to paint delamination and rust development on tanks that Northern had built for two other Ellicott dredges.  Specifically, Ellicott alleged that in November 2020, it was forced to discount by $60,000 the sale price of one dredge due to the condition of its Northern-built tanks, and by March 2021, paint delamination on Northern tanks installed in a different dredge sold in July 2019 caused it to suffer "reputational consequences" with another customer.  (Amend. Arb. Compl. (dkt. #1-3) ¶¶ 46, 53.)  As with the tank set incorporated into the Southwind dredge, Ellicott alleges that Northern knowingly failed to sandblast the surfaces of those tanks properly, then failed to use primer or apply paint "consistent with industry standards."  (*Id.* at ¶ 55.)

With respect to the tank set in the Southwind dredge alone, Ellicott now alleges Northern: (1) breached their contract by failing to adhere to the manufacturing specifications that Northern was bound to follow (*id.* at ¶¶ 58-60); (2) breached its express warranty (*id.* at ¶¶ 63-65); (3) breached its implied warranty of merchantability (*id.* at ¶¶ 68-70); and (4) breached its implied warranty of fitness for a particular purpose (*id.* at ¶¶ 73-77).  With respect to the tank set in the Southwind dredge and the tanks in the two other dredges discussed above, Ellicott further alleges that Northern: (5) was negligent when it "provided Ellicott with defective tanks that were incapable of holding paint when placed in the water" (*id.* at ¶¶ 80, 81); (6) negligently misrepresented its painting and finishing abilities (*id.* at ¶¶ 84-93); and (7) fraudulently misrepresented its abilities to adequately complete the scope of its work (*id.* at ¶¶ 96-103).

Finally, as to all three dredge sales, Ellicott alleges that it has suffered or continues

to suffer damages (*id.* at ¶¶ 61, 66, 71, 78, 82, 94, 104) and seeks: (1) an award "in an amount not less than full reimbursement" for the tank set incorporated into the Southwind dredge and the $60,000 price reduction Ellicott was forced to offer on the discounted dredge, totaling $340,200; (2) punitive damages for Northern's "fraud"; and (3) "such other and further relief as the Arbitrator deems just and appropriate[.]"  (*Id.* at 20.) EMCASCO is currently defending Northern in the arbitration while asserting a full reservation of rights.[3]

## OPINION

Summary judgment is often an appropriate method to determine insurance policy coverage. *Home Ins. Co. v. Phillips*, 175 Wis. 2d 104, 109, 499 N.W.2d 193 (Ct. App. 1993); *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 512 (7th Cir. 2022) (under Indiana law, "[p]roper interpretation of an insurance policy, even if it is ambiguous, generally presents a question of law that is appropriate for summary judgment").  Of course, under Fed. R. Civ. P. 56(a), a movant seeking declaratory relief must establish "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" and judgment must be denied if that burden is not met.  *Mt. St. Helens Min. & Recovery Ltd. P'ship v. United States*, 177 F. Supp. 2d 1143, 1150 (W.D. Wash. 2001).

The parties agree that Wisconsin substantive law applies to the court's analysis of the relevant policy provisions (dkt. #22, at 6 and dkt. #25, at 1), and the court has

---

[3] EMCASCO named Ellicott in this action as an "interested party" with respect to its claim for declaratory relief against Northern.  (Pl.'s Compl. (dkt. #1, ¶ 5).)

identified no facts or caselaw suggesting otherwise.  The parties also agree that the general liability policy alone does not cover the claims asserted against Northern in the arbitration, and that any obligation for EMCASCO to defend it arises under the E&O endorsement. (Dkt. #22, at 11 and Dkt. #25, at 1-2.)  Accordingly, the court will address EMCASCO's obligations towards Northern in the E&O endorsement under Wisconsin law, then turn to its application with respect to the claims asserted by Ellicott in the arbitration proceedings.

## I.  The E&O Endorsement

As with other contracts governed by Wisconsin law, insurance policies are interpreted to effectuate the contracting parties' intent.  *Water Well Sols. Serv. Grp., Inc. v. Consolidated Ins. Co.*, 2016 WI 54, ¶ 14, 369 Wis. 2d 607, 881 N.W.2d 285 (citing *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65). In assessing coverage, the court "compare[s] the four corners of the underlying complaint to the terms of the entire insurance policy."  *Water Well Sols.*, 2016 WI 54, ¶ 15 (internal citations omitted).  Thus, the underlying complaint and the insurance policy are the *only* documents relevant to the coverage analysis.  *Marks v. Houston Cas. Co.*, 2016 WI 53, ¶ 39, 369 Wis. 2d 547, 881 N.W.2d 309 (citing *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, ¶ 19, 261 Wis. 2d 4, 660 N.W.2d 666).

However, the court interprets an insurance policy's terms "as a reasonable person in the position of the *insured* would understand such language."  *Water Well Sols.*, 2016 WI 54, ¶ 14 (emphasis added) (citing *Estate of Sustache v. Am. Family Mut. Ins. Co.*, 2008 WI 87, ¶ 19, 311 Wis. 2d 548, 751 N.W.2d 845).  In so doing, the court "must liberally construe the allegations contained in the underlying complaint, assume all reasonable

inferences from the allegations made in the complaint, and resolve any ambiguity in the policy terms in favor of the insured." *Id.* at ¶ 15 (citing *Sustache*, 2008 WI 87, ¶ 21); *Choinsky v. Emp'rs Ins. Co. of Wausau*, 2020 WI 13, ¶ 16, 390 Wis. 2d 209, 938 N.W.2d 548. Moreover, "[t]he legal label applied to the claim is not determinative; what matters is whether the conduct alleged in the complaint is arguably within a category of wrongdoing covered by the policy." *Air Eng'g, Inc. v. Indus. Air Power, LLC*, 2013 WI App 18, ¶ 10, 346 Wis. 2d 9, 828 N.W.2d 565 (citing *Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir. 1994)). Even so, the insured has the initial burden of showing that the claims asserted against it fall within the policy's initial grant of coverage. *Day v. Allstate Indem. Co.*, 2011 WI 24, ¶ 26, 332 Wis. 2d 571, 798 N.W.2d 199.

Generally, the court must decide if the insurance policy language covers the complaint's allegations. *Water Well Sols.*, 2016 WI 54, ¶ 16 (citing *Sustache*, 2008 WI 87, ¶ 22). If not, that is the end of the inquiry, and the insurer has no duty to defend. *Id.* On the other hand, if the allegations fall within the policy's coverage grant, then the court must determine whether a policy exclusion precludes coverage. *Id.* (citing *Sustache*, 2008 WI 87, ¶ 23). Each exclusion in an insurance policy is analyzed separately from all other exclusions to the same coverage. *Am. Girl, Inc.*, 2004 WI 2, ¶ 24. If no exclusion precludes coverage, then the insurer has a duty to defend. Even if exclusions apply, the insurer may still have a duty to defend if "an exception to the exclusion applies to restore coverage." *Water Well Sols.*, 2016 WI 54, ¶ 16 (citing *Sustache*, 2008 WI 87, ¶ 23). If not, then the

insurer has no duty to defend.[4]  *Id.* (citing *Am. Girl, Inc.*, 2004 WI 2, ¶ 24).  A court interpreting an insurance policy exclusion presumes that a reasonable insured understands that the exclusion limits coverage; however, if the exclusion is ambiguous, "it will be construed in favor of coverage."  *Phillips v. Parmelee*, 2013 WI 105, ¶ 15, 351 Wis. 2d 758, 840 N.W.2d 713 (citations omitted).  Under Wisconsin law, a "basic canon of construction" is that exclusions are "narrowly construed against the insurer."  *Day*, 2011 WI 24, ¶ 29.

Finally, where the complaint's allegations fall within the policy's grant of coverage and no exclusions otherwise preclude coverage, an "insurer has a duty to defend when the allegations, if proven, give rise to the possibility of recovery under the terms of the policy."  *Air Eng'g.*, 2013 WI App 18, ¶ 10 (citing *Fireman's Fund*, 2003 WI 33, ¶ 19).  This is true even if the allegations are entirely baseless.  *Olson v. Farrar*, 2012 WI 3, ¶ 29, 338 Wis. 2d 215, 809 N.W.2d 1; *see also Marks*, 2016 WI 53, ¶ 39 ("[W]hen a complaint alleges facts that, if proven, would constitute a covered claim, the insurer must appoint defense counsel for its insured without looking beyond the complaint's four corners." (quoting *Sustache*, 2008 WI 87, ¶ 27)).  If the insurance policy provides coverage for one claim in the underlying suit, the insurer must defend *all* claims alleged.  *West Bend Mut. Ins. Co. v. Ixthus Medical Supply, Inc.*, 2019 WI 19, ¶ 14, 385 Wis. 2d 580, 923 N.W.2d 550.

Here, the E&O endorsement modifies insurance provided under Northern's general liability policy.  Under the endorsement, EMCASCO "will pay those sums that [Northern]

---

[4] "When one exclusion applies to preclude coverage, the inapplicability of another exclusion does not restore coverage."  *Water Well Sols.*, 2016 WI 54, ¶ 33 (citing *Am. Girl, Inc.*, 2004 WI 2, ¶ 24); *Phillips v. Parmelee*, 2013 WI 105, ¶ 35 n.15, 351 Wis. 2d 758, 840 N.W.2d 713.

becomes legally obligated to pay as 'damages' because of a 'manufacturer's error or omission' to which [the] insurance applies." (Policy (dkt. #1-4) 54.) The endorsement grants EMCASCO "the right and duty to defend the insured against any 'suit' seeking those 'damages.'" (*Id*.) However, the endorsement also warns that EMCASCO "will have no duty to defend the insured against any 'suit' seeking 'damages' to which this insurance does not apply." (*Id.* at 54.)

The endorsement defines the relevant terms as follows:

| Term | Definition |
|------|-----------|
| "manufacturer's error or omission" | "[A]n insured's negligent manufacture of a tangible product resulting in the failure of that tangible product to perform the function or serve the purpose intended after it left the possession of any insured."<br><br>(Policy (dkt. #1-4) 58.) |
| "damages" | "[C]onsequential financial loss sustained by [the insured's] customer, due to a 'manufacturer's error or omission' [that] did not arise from any sudden and accidental physical injury to [the insured's] product.<br><br>'Damages' does not include:<br><br>a. The purchase or contract price for '[the insured's] product.'<br><br>b. Costs and expenses incurred by [the insured] or on [the insured's] behalf to fulfill a warranty, representation, or promise provided with '[the insured's] product.'<br><br>c. Costs to restore goodwill of '[the insured's] customer."<br><br>(*Id.*) |

10

| "suit" | "[A] civil proceeding in which 'damages' because of a claim to which this insurance applies are alleged[,]" including "an arbitration proceeding . . . to which the insured must submit or does submit with [EMCASCO's consent] or "[a]ny other alternative dispute resolution . . . to which the insured submits with [EMCASCO's] consent." <br><br> (*Id.*) |
| --- | --- |

This endorsement also includes a number of exclusions, detailing what it does *not* cover.  These include in relevant part:

| Policy Provision | Exclusion |
| --- | --- |
| Property Damage, Personal and Advertising Injury Exclusion | "'Damages' arising from 'bodily injury', 'property damage', or 'personal and advertising injury'." <br><br> "'Property damage' means physical injury to tangible property including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it." <br><br> (Policy (dkt. #1-4) 55, 58.) |
| Intentional Injury Exclusion | "'Damages' which may reasonably be expected to result from the intentional or criminal acts of an insured or which is in fact expected or intended by the insured, even if the injury or 'damage' is of a different degree or type than actually expected or intended." <br><br> (*Id.* at 55.) |
| Manufacturer's Warranties Exclusion | "'Damages' arising from manufacturer's warranties or guarantees, whether express or implied." <br><br> (*Id.*) |
| Non-Compensatory Damages Exclusion | "All claims: . . . [for] punitive or exemplary damage or any other type of non-compensatory damages[.]" <br><br> (*Id.*) |

## II. Application of E&O Obligations to Claims Brought Against Northern

### A. Excluded Claims (Breach of Express Warranty (Count 2); Breach of Implied Warranty of Merchantability (Count 3); Breach of Implied Warranty of Fitness for a Particular Purpose (Count 4); Fraudulent Misrepresentation (Count 7); Punitive Damages)

While a coverage question typically begins with the four-corners analysis, if an exclusion "clearly bars coverage," the court "need not examine a potentially more difficult question of whether the policy under the 'four corners' rule grants coverage." *State v. GE-Milwaukee, LLC*, 2012 WI App 5, ¶ 7, 338 Wis. 2d 349, 808 N.W.2d 734.  That is the case for three categories of claims against Northern that are plainly barred from coverage under the E&O endorsement.

First, the Manufacturer's Warranties Exclusion removes from coverage any claim seeking damages "arising from manufacturer's warranties or guarantees, whether express or implied."  (Policy (dkt. #1-4) 55.)  That unambiguously excludes Ellicott's claims against Northern for breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose as alleged in Counts 2, 3, and 4 of its amended complaint.  (Amend. Arb. Compl. (dkt. #1-3) ¶¶ 63-65, 68-70, 73-77.)

Second, the Intentional Injury Exclusion precludes coverage for claims "which may reasonably be expected to result from the intentional or criminal acts of an insured or which is in fact expected or intended by the insured, even if the injury or 'damage' is of a different degree or type than actually expected or intended."  (Policy (dkt. #1-4) 55.)  Because fraudulent misrepresentation is an intentional tort under Wisconsin law, *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699 N.W.2d 205,

the E&O endorsement does not apply to Ellicott's claim of fraudulent misrepresentation as alleged in Count 7 of its complaint.  (Amend. Arb. Compl. (dkt. #1-3) ¶¶ 96-103.)

Third, the Non-Compensatory Damages Exclusion excludes claims for "punitive or exemplary damage or any other type of non-compensatory damages[.]"  (Policy (dkt. #1-4) 55.)  Ellicott has demanded an award of punitive damages for Northern's "fraud[.]" (Amend. Arb. Compl. (dkt. #1-3) 20.)  Thus, although the Intentional Injury Exclusion already bars coverage for damages arising out of Ellicott's fraudulent misrepresentation claim, the Non-Compensatory Damages Exclusion also removes any other claim for punitive damages from the scope of coverage.

Consequently, EMCASCO has shown that it *is* entitled as a matter of law to a declaratory judgment that it does not need to indemnify Northern in connection with Counts 2, 3, and 4 of Ellicott's complaint seeking recovery for breaches of warranty, Count 7 of Ellicott's complaint seeking recovery for fraudulent misrepresentation, or Ellicott's demand for punitive damages, pursuant to the corresponding exclusions in the E&O endorsement.

### B. Scope of Covered Claims (Breach of Contract (Count 1); Negligence (Count 5); Negligent Misrepresentation (Count 6))

That leaves Northern with possible coverage under the E&O endorsement for Ellicott's claims alleging breach of contract, negligence, and negligent misrepresentation as claimed in Counts 1, 5, and 6 of the complaint.  (Amend. Arb. Compl. (dkt. #1-3) ¶¶ 58-60, 80, 81, 84-93.)  Although Ellicott's breach of contract claim involves only the tanks that were incorporated into the Southwind dredge, its negligence and negligent

misrepresentation claims against Northern arise out of similar allegations involving:  (1) the tanks that formed part of the Southwind dredge; (2) the tanks on the dredge for which Ellicott had to reduce the sale price by $60,000; *and* (3) the tanks on the dredge that allegedly caused Ellicott to suffer reputational consequences.   However, the claims involving the latter two sets of tanks are plainly excluded by the terms of the E&O endorsement.  The kinds of "damages" for which EMCASCO is required to indemnify its insured neither include "the purchase or contract price" for the insured's "product" nor "[c]osts to restore goodwill of [the insured's] customer[.]"  (Policy (dkt. #1-4) 58.)  As a result, EMCASCO has also shown that it is entitled as a matter of law to a declaratory judgment that the E&O endorsement excludes coverage of Ellicott's claims against Northern for diminution in value or loss of customer goodwill for both of the latter two tank sets.

This, in turn, leaves the remaining claims for which EMCASCO *may* be required to indemnify Northern in the event Ellicott prevails in the arbitration:  Ellicott's claims for breach of contract, negligence, and negligent misrepresentation arising from the tanks that were built into the Southwind dredge.  As discussed above, the E&O endorsement provides that EMCASCO will pay sums that Northern becomes legally obligated to pay as "damages" because of a "manufacturer's error or omission" to which the endorsement applies.  (*Id.* at 54.)  Thus, as to the potentially covered claims against Northern, Ellicott's amended complaint must allege circumstances that meet the endorsement's definitions of "manufacturer's error or omission" and "damages."

Again, a "manufacturer's error or omission" is "an insured's negligent manufacture

of a tangible product resulting in the failure of that tangible product to perform the function or serve the purpose intended after it left the possession of any insured." (*Id*. at 58.)  EMCASCO concedes, as it must, that Ellicott is alleging the tanks in the Southwind dredge were negligently manufactured.  (Dkt. #25, at 3-4.)  As a result, Ellicott's claims for negligence, negligent misrepresentation, and breach of contract would presumptively fall within the scope of the E&O endorsement.   EMCASCO nevertheless argues that neither Northern nor Ellicott allege facts suggesting that the tanks failed to perform their function or serve the purpose for which they were intended.   In particular, EMCASCO argues that Ellicott's allegations of paint delamination and rusting on those tanks fail to support that inference.  (*Id*. at 4.)

However, EMCASCO's argument is belied by the plain language of Ellicott's complaint, which describes a "defective" tank set incorporated into the Southwind dredge that was "deficiently prepared, leached paint, and rusted upon being placed in the water -- failing at the very function for which it was designed and produced."  (Amend. Arb. Compl. (dkt. #1-3) ¶¶ 61, 63-65, 70, 77, 81, 93.)  Despite EMCASCO's efforts to argue otherwise, a "defect" is "an imperfection or abnormality that impairs *quality, function, or utility*[.]"  Merriam-Webster, https://www.merriam-webster.com/dictionary/defect (last visited Feb. 7, 2024) (emphasis added).  That definition plainly encompasses what Ellicott has pleaded with respect to the tanks installed on the Southwind dredge, and certainly what a reasonable policyholder would understand to be a "manufacturer's error or

omission" covered by the E&O endorsement here.[5]

The Seventh Circuit took a similarly broad view of the kinds of allegations that give rise to coverage under a liability policy insuring against damages caused by certain kinds of product defects.  Specifically, although it does not control the result in this case, the Seventh Circuit in *Carboline Co. v. Home Indem. Co.,* 522 F.2d 363 (7th Cir. 1975), held that damages caused by the "peeling, cracking, and rusting" of an insured's coating on a power plant's cooling tank could have been provoked by the coating's "active malfunctioning[,]" which was excepted from an exclusion barring coverage of damages resulting from the failure of the insured's products "to perform the function or serve the purpose intended[.]"  *Id.* at 366-68.  However, applying Illinois law, the Seventh Circuit found that because it was not clear on the pleadings that "the claim against . . . [the] insured excludes the possibility of recovery for an active malfunction of the coating[,]" it was improper to grant summary judgment in the insurer's favor.  *Id.* at 367.

In fairness to EMCASCO, some of the language discussing the tanks' alleged defects appears to relate to claims in the amended complaint that are *not* covered under the E&O endorsement.  For instance, the allegation that the tank set "fail[ed] at the very function for which it was designed and produced" was also part of Ellicott's claim that Northern violated its implied warranty of merchantability, which, as discussed above, is not a claim that EMCASCO is required to cover.  (*Id.* at ¶ 70.)  However, as Northern points out,

---

[5] EMCASCO's related argument that Ellicott's allegations fall outside a failure-to-perform claim because Northern's tanks performed at least for some months as intended also fails, since these tanks were obviously intended for long-term, industrial use, and their purported rapid deterioration undermines their "quality, function or utility" for this purpose as well.

Wisconsin courts have "repeatedly rejected the argument that insurance coverage is dependent upon the theory of liability." *1325 North Van Buren, LLC v. T-3 Grp., Ltd.*, 2006 WI 94, ¶ 58, 293 Wis. 2d 410, 716 N.W.2d 822.  Although Wisconsin's economic loss doctrine "may limit a party to contract rather than tort remedies," *id.* at ¶ 59, in *1325 North Van Buren*, the Wisconsin Supreme Court held that within the context of a professional liability insurance policy like the one here, "claims of negligence in the failure to provide competent professional services could raise both tort and contract claims."[6] *Crum & Forster Spec. Ins. Co. v. DVO, Inc.*, 939 F.3d 852, 855 (7th Cir. 2019) (citing *1325 North Van Buren*, 2006 WI 94, ¶ 57).  As a result, "how a malpractice claim is pled -- in tort or contract -- does not matter for purposes of determining whether a policy affords coverage." *1325 North Van Buren*, 2006 WI 94, ¶ 55.

In contrast with Ellicott's claims for intentional torts, breach of warranty, or punitive damages -- which are subject to exclusions under the E&O endorsement for reasons already discussed -- EMCASCO has not identified any exclusion that could even arguably bar coverage for Ellicott's contract and tort claims ultimately sounding in negligence.  At bottom, regardless of the causes of action used to frame them, Ellicott's remaining claims against Northern for breach of contract, negligence, and negligent misrepresentation all arise out of a common "manufacturer's error or omission[;]" namely,

---

[6] The parties did not raise the possibility that Ellicott's negligence claims could be barred by the economic loss doctrine in their briefing.  However, the doctrine should not be used to ascertain insurance policy coverage. *5 Walworth, LLC v. Engerman Contracting, Inc.*, 2023 WI 51, ¶ 18, 408 Wis. 2d 39, 992 N.W.2d 31.  Unlike the threshold question of policy coverage currently before the court, which is governed by Wisconsin law, Ellicott's ability to recover under a negligence theory is instead dictated by Maryland law and a question for the arbitrators to decide.  (Amend. Arb. Compl. (dkt. #1-3) ¶ 8.)

that the tanks in the Southwind dredge were negligently built and not fit for purpose at the time they were sold to Ellicott.

Alternatively, EMCASCO contends that the Manufacturer's Warranties exclusion somehow excludes *all* of Ellicott's claims against Northern.  As previously discussed, however, exclusions are narrowly construed against the insurer, and any ambiguity will be construed in favor of coverage.  *Day*, 2011 WI 24, ¶ 29.  Again, in determining an exclusion's applicability, this court "must focus on the incident that allegedly gave rise to the coverage, not the theory of liability." *Crum*, 939 F.3d at 855.  Ellicott's warranty claims do not "arise from" solely those warranties, but rather from Northern's allegedly negligent conduct.  Moreover, under Wisconsin law, "'arising out of' language is broadly construed." *Id.* at 856 (citations omitted).  Where, for instance, an E&O endorsement bars claims arising out of breaches of contract, "a claim that purports to be a tort claim can be excluded . . . if it arises out of that contract." *Id*. at 855.  Here, however, something different is alleged -- warranty claims arising out of what is, at its heart, a tort claim -- and once again, "what matters is whether the conduct alleged in the complaint is arguably within a category of wrongdoing covered by the policy." *Air Eng'g*, 2013 WI App 18, ¶ 10.

Nor is EMCASCO's interpretation of the Manufacturer's Warranties exclusion "in harmony" with the rest of the E&O endorsement, which must be considered as a whole "to give reasonable meaning to the entire policy." *1325 North Van Buren*, 2006 WI 94, ¶ 64.  If the warranty exclusion precludes all claims involving breaches of warranties, it would "not [be] necessary for the policy to include" other exclusions since they would "be superfluous if the policy could never afford coverage for" them. *Id*.  EMCASCO speculates

that Northern could have disclaimed all warranties to preserve its insurance coverage, but it fails to identify any language in the E&O endorsement or the broader Commercial General Liability policy that would require Northern to do so.  (Dkt. #25, at 12.)  In fact, the Commercial General Liability policy's controlling language defining a covered "product" suggests that Northern would, or at minimum could, provide warranties.  (Policy (dkt. #1-4) 29.)  ("'Your product' . . . [i]ncludes: [w]arranties or representations made . . . with respect to the fitness, quality, durability, performance or use of 'your product[.]'")  While warranty claims themselves are clearly excluded from coverage under the E&O endorsement, the exclusion must necessarily be limited to bar the kinds of claims -- and only the kinds of claims -- it says it does.

Consequently, EMCASCO must defend Northern if Ellicott's amended complaint seeks relief meeting the E&O endorsement's definition of "damages," which are defined as "consequential financial loss sustained by [the insured's] customer, due to a 'manufacturer's error or omission'" that "did not arise from any sudden and accidental physical injury to" the insured's "product."  (*Id.* at 58.)  Although Ellicott's amended complaint does not provide much detail about the kinds of damages it suffered due to Northern's covered "error or omission" under the E&O endorsement, a liberal construction of the policy and complaint suggests that Ellicott's settlement with Southwind and other asserted past and future "damages" would constitute consequential financial loss.  *Water Well Sols.*, 2016 WI 54, ¶ 38.

Finally, in a last-ditch effort to avoid defending Northern in the arbitration, EMCASCO argues that *all* of Ellicott's losses arose out of "physical injury to tangible

19

property" (dkt. #19, at 25), and those injuries constitute excluded "'property damage' . . . in the form of rusting and delamination of the tanks" under the E&O endorsement's Property Damage exclusion (dkt. #25, at 7-10).  However, the parties agree that there is *no* allegation that any of the tanks at issue sustained a "sudden and accidental physical injury" that would take them outside of the definition of "damages" (dkt. #19, at 22), and there is *no* allegation of fact or other relevant evidence suggesting that the tanks' rusting and delamination constitutes  a "physical injury" as contemplated in the Property Damage Exclusion.  (Policy (dkt. #1-4) 55, 58.)  Again, exclusions are narrowly construed against the insurer, and ambiguity will be construed in favor of coverage.  Moreover, to the extent there is any arguable ambiguity in the definition of "property damage" here, the court must find that this exception does not exclude coverage for Ellicott's claims.

In particular, even EMCASCO concedes that the Property Damage exclusion would not bar "coverage for consequential financial loss sustained by one of [Northern's] customers as a result of a tank that was properly manufactured, with no physical injury to it, but which did not meet engineering dimensions and was, therefore, too small for its intended application such that the customer could not incorporate it into a larger system and incurred costs to replace it with a tank that had proper dimensions."  (Dkt. #25, at 12.)  Thus, absent a showing that the tanks on the Southwind dredge experienced a "physical injury" -- whether because the tanks were "too small" or did not meet their provided paint specifications -- Ellicott's allegations in the arbitration control here, and they only differ on one, key detail that, if anything, brings the claim even further within the E&O endorsement's grant of coverage: that Northern's tank set was negligently

manufactured, leading Ellicott to suffer consequential financial losses.

As both parties acknowledge, an insurer's duty to defend its insured is broader than its duty to indemnify. *Steadfast Ins. Co. v. Greenwich Ins. Co.*, 2019 WI 6, ¶ 28, 385 Wis. 2d 213, 922 N.W.2d 71. An insurer must defend if it *could* be required to indemnify, even if the insured is not ultimately found liable. *Id.* Since EMCASCO *may* have a duty to indemnify Northern if Ellicott prevails on its claims relating to the Southwind dredge in Counts 1, 5, or 6 of its complaint, EMCASCO necessarily has a duty to defend Northern on *all* of Ellicott's claims. *West Bend Mut. Ins. Co.*, 2019 WI 19, ¶ 14; *see also Steadfast Ins. Co.*, 2019 WI 6, ¶ 28 ("the duty to defend arises from allegations in the complaint, while the duty to indemnify is dependent on fully developed facts"). Accordingly, with respect to Ellicott's breach of contract, negligence, and negligent misrepresentation claims relating to the Southwind dredge only, EMCASCO's motion for summary declaratory judgment will be denied, and it must continue to defend Northern in its dispute with Ellicott.[7]

---

[7] Northern's counsel in the arbitration cannot mount a defense that only invites a finding of liability on claims that are not covered under the E&O endorsement, nor can it settle on terms that would preclude any coverage for Northern at all. Under Wisconsin law, "[w]hen a conflict exists between the interests of an insurance company and the interests of an insured, and the insurance company has control over the claim, the insurance company has a duty to act in good faith to protect the interests of the insured." *Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 2010 WI 49, ¶ 112, 325 Wis. 2d 56, 784 N.W.2d 542.

ORDER

IT IS ORDERED that:

1)  Plaintiff's motion for summary declaratory judgment (dkt. #18) is DENIED IN PART and GRANTED IN PART as set forth above.

2)  Barring good cause shown within fourteen days of this ruling, the clerk of court is directed to enter final judgment and administratively close this case.

Entered this 7th day of February, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

22